1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          :      CR-02-606(FB)

                    Plaintiff,     :

    - against -                    :      United States Courthouse
                                          Brooklyn, New York

PETER GOTTI, et al.,               :
                                          December 20, 2002
                    Defendant. :          3:00 PM
- - - - - - - - - - - - - - - X


     TRANSCRIPT OF STATUS CONFERENCE
     BEFORE THE HONORABLE FREDERIC BLOCK
     UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:              ROSLYNN R. MAUSKOPF
                                United States Attorney
                                One Pierrepont Plaza
                                Brooklyn, New York 11201
                                BY:  ANDREW GENSER, AUSA
                                     KATJA JESTIN, AUSA

Official Court Reporter:        Diana Pereira, RPR-CSR-CRR
E-mail: ForDiana@aol


     Proceedings recorded by computerized stenography.
     Transcript produced by Computer Aided Transcription.

2

For the Defendants:

                              GERALD SHARGEL, ESQ.
                              SARITA KEDIA, ESQ.
                              LESLIE DUBIOS, ESQ.
                              (For P. Gotti)


                              GEORGE SANTANGELO, ESQ.
                              (For A. Ciccone)


                              JOSEPH CORROZZO, ESQ.
                              (For R.V. Gotti)


                              RICHARD WARE LEVITT, ESQ.
                              (For P. Cassarino)


                              GERALD SHARGEL, ESQ.
                              (For J. Brancato)


                              HARRY BATCHELDER, ESQ.
                              (For R.G. Gotti)


                              RICHARD MEDINA, ESQ.
                              (For R. Bondi)

3

1          THE CLERK:  Criminal cause for a status conference,
2    United States of America versus Peter Gotti, et al.
3          I ask the parties if you can state your
4    appearances, for the record.
5          MR. GENSER:  Andrew Genser for the Government.
6    Good afternoon, your Honor.
7          MS. JESTIN:   Katya Jestin for the government.
8          THE COURT:  If you would be kind enough, I am going
9    to ask you to tell the Court who is here for the defendants,
10   Mr. Shargel.
11         MR. SHARGEL:  Yes, your Honor.  I am of course
12   standing before you on behalf of Peter Gotti, with my
13   associate, Leslie Dubios.
14         Mr. Santangelo is here representing Anthony
15   Ciccone.
16         MR. SANTANGELO:  Mr. Mitchell is always here.
17         MR. SHARGEL:  Yes.  John Mitchell as well.
18         Joseph Corrozzo represents Richard V. Gotti.
19         Rich Levitt is here, represents Primo Cassarino.
20         I am standing in on behalf of Mr. Tacopina this
21   afternoon because he was out of the district, for Jerome
22   Brancato.
23         Rich Gotti is here represented by Harry Batchelder.
24         Richard Bondi is here represented by Rich Medina.
25         THE COURT:  I appreciate that.  No slight to any of

4

1   the fine array of attorneys here.  I think I can call upon

2   Mr. Shargel to do some administrative work for the Court, to

3   move things along.

4           We have a lot of things to talk about today.

5   What's the right order of priority?

6           I guess the first thing we ought to talk about is

7   how you folks have progressed with the jury questionnaire.

8           Why don't you report to the court first,

9   Mr. Genser.

10          MR. GENSER:  Judge, actually, if the Court wouldn't

11  mind, I defer to Mr. Shargel on that.

12          THE COURT:  All right.  Mr. Shargel.

13          MR. SHARGEL:  The parties have spoken.  Your Honor,

14  apparently, there is more time that is needed to deal with

15  the question of the jurors that should be agreed upon to be

16  stricken for cause.  We are ready.  We have our list.  I am

17  prepared to give our list to the government this afternoon.

18  I could even supply the list to the Court.  Then, later this

19  week or early next week we will have a full report for your

20  Honor.

21          THE COURT:  You need a little more time.  You are

22  making satisfactory progress?

23          MR. SHARGEL:  We definitely are.  As I said, I have

24  the list right here.

25          THE COURT:  What I am contemplating doing, just to

5

1   give you all a heads up in terms of how we are going to

2   process the selection of the jury, it will be something like

3   this.

4           I will be here next Monday, Tuesday, and Thursday

5   at your disposal.  For sure we have to come to rest with the

6   number of qualified jurors who will be subject to be in

7   summons for potential selection come January 6th.

8           Maybe I should put this down for Tuesday for that

9   purpose.

10           MR. SHARGEL:  The only problem with Tuesday, Judge,

11   is that obviously -- That's Christmas Eve.

12           THE COURT:  I am open to discussions.

13           MR. SHARGEL:  I suggest -- let me canvass the

14   array.

15           THE COURT:  I could do it Thursday.  That is the

16   best.

17           MR. SHARGEL:  Here is what we'll do.  Since I am of

18   the Hebrew persuasion, as you might know, I can be here on

19   Tuesday representing -- if the defendants are excused,

20   because this is really just roll up your sleeves and work on

21   what the challenges are.  If the defendants are excused and

22   if certain counsel are excused, those counsel that are

23   excused I will stand in for.  This is a selective effort so I

24   won't have the authority to speak on behalf of every

25   defendant.  We can do it on Tuesday.

1          THE COURT:  There is going to be a joint selection

2     process.  As long as everybody here agrees to allow me to

3     meet with the government attorney and Mr. Shargel on Tuesday

4     to hear whatever problems you may have in terms of the jury

5     questionnaire scenario, we can proceed on that basis.

6          Anybody have any problems with that.

7          MR. CORROZZO:  No, your Honor, with the

8     understanding also that the defendants will be excused.

9          THE COURT:  Yes.

10         MR. GENSER:  We can be here Tuesday morning.  I

11    would ask if we could do it possibly in the morning because

12    there are travel issues later in the day.

13         THE COURT:  Let's look at 10:00.

14         MR. SHARGEL:  That is fine.

15         THE COURT:  We have to get that done because I am

16    told by the people in charge of making copies of things they

17    have to have everything as soon as possible to do the

18    necessary ministerial work to get everything in order.  We

19    will be able to attend to that Tuesday.

20         MR. SHARGEL:  I would like alert your Honor to the

21    fact from our side there is a substantial number.  I think we

22    will have no problem with this very theory ultimately, or I

23    hope there is no problem ultimately.  I want to alert you to

24    the fact there are a substantial number of jurors where it

25    seems obvious that calling them back would be fruitless.

1          THE COURT:  You compile it.  Discrete lists.  I
2    will make my calls on it.  We'll try to get it done with
3    Tuesday.  If not, I will finish it up on Thursday.  We will
4    use next week for that purpose.

5          MR. SHARGEL:  Fine.  I have a catalog.  It is not a
6    long catalog.  I have a number of housekeeping issues in
7    order to get this case trial ready.  I would like to put them
8    before your Honor, if I may.  I would like to deal with them
9    before your Honor goes away.  I would like to deal with them
10   in the presence of all counsel and defendants.

11         THE COURT:  We are here to spend whatever time is
12   needed today to take care of a host of things.  I have these
13   motions I want to address as well.  Couple of other thoughts
14   on my mind.

15         Before we engage in that colloquy, let me just
16   return to the jury selection process.

17         Here is what I plan to do. Each of my colleagues
18   does it a little differently but this is what I am most
19   comfortable with doing, and I invite your suggestions if you
20   have any issues with what I am about to propose.

21         On January 6, I plan to summon 80 perspective
22   jurors to court based upon what comes out of the
23   questionnaire process.  Then, instead of questioning each one
24   individually, which I think is tedious and not necessarily,
25   you know, economical in terms of the effective use of our

1    time, I am going to have waves of seven come into the

2    courtroom at a time.  We'll question those seven

3    collectively.

4         If, you know, something happens untoward, we'll

5    lose seven jurors.  I don't think there is a great risk here

6    that we are going to have a problem if I take seven at a

7    time.  The others will be kept outside of the courtroom and

8    we'll bring in seven subsequent panels, so to speak, as we

9    address each of these panels in turn.

10        Then I will ask some questions which will give you

11   folks the opportunity to hear them speak which is important.

12   At that time, I will also solicit whatever specific questions

13   you would like me to post to those individual jurors.  I

14   think that can be handled okay.

15        We're going to then proceed until we qualify the

16   requisite number to spread throughout the courtroom on the

17   6th of January for exercise of the challenges.

18        MR. SHARGEL:  If I may.  I probably have gone

19   through this process --

20        THE COURT:  You have done it more than I have.

21        MR. SHARGEL:  -- a lot of times.

22        I know that you want to do it as expeditiously as

23   possible.  I know, also, you have discretion to do it in any

24   way you choose fit.

25        Please let me tell you that when we have a

9

1    questionnaire such as the questionnaire we have here, this is

2    a questionnaire that's been used in this district before in

3    substantial part.  The problem is it delves into opinions

4    about government cooperators, about the subjects that will be

5    raised at trial, and allegations of organized crime.

6          It has been my experience that when a prospective

7    juror is asked follow-up questions on what they've said in

8    the questionnaire -- I am not talking about the people that

9    obviously have been disqualified with expressions of blatant

10   prejudice.  When the following is done, it will be -- there

11   are two problems as I see it.

12         THE COURT:  You think I have to do it one by one?

13         MR. SHARGEL:  Everyone has done it by one by one.

14         I know that Judge Korman, Judge Trager -- I could

15   name every judge in the courthouse.  Everybody has done it

16   one by one because necessity dictates that.

17         Your Honor, I don't want to be the profit of gloom

18   but I think if your Honor starts it the way that you suggest,

19   it is going to take more time in the end.  I know that

20   Mr. Genser has been through this with me on a trial before.

21         THE COURT:  It just seemed to me I could handle a

22   couple at a time.

23         What do you think?

24         MR. GENSER:  I think, as a practical matter, even

25   if you have seven seated in the jury box, it is going to turn

1    out to be individual questioning anyway.  Given the risk of
2    something being said that affects somebody else, if we are
3    going to end up in that situation -- I haven't done it as
4    many times as Mr. Shargel but I have done it a few times.  It
5    has been the one on one.  I think we can do it quickly.  I
6    would tend to agree that's the issue.

7             THE COURT:  I will do it one by one.  I was
8    thinking of a way of probably moving the process along a
9    little more expeditiously than that.

10            I thought hard about it.

11            MR. GENSER:  We could try it.

12            MR. SHARGEL:  I strongly suggest the one by one.
13   There is a reason why everyone in the Southern District,
14   everyone in the Eastern District has done it this way.  I
15   respect innovation.

16            THE COURT:  Can I place my own unique imprimatur on
17   the process.

18            MR. SHARGEL:  I am just concerned we are going to
19   run into a problem.

20            THE COURT:  You don't want a copy-cat judge, do
21   you?

22            MR. SHARGEL:  No, I never wanted that.

23            THE COURT:  All right.  We'll do it one by one.
24   Nobody has raised a question of whether anybody wants
25   additional peremptory challenges?

1          MR. SHARGEL:  That is something I wanted to raise

2     with you.

3          THE COURT:  Let's do that now.  Maybe

4     Mr. Santangelo would like to stand next to you.

5          MR . SANTANGELO: I will let Mr. Shargel handle it.

6          MR. SHARGEL:  I welcome anyone.

7          Under the rule we're afforded ten, government six.

8     Under the rule we have the opportunity to ask for additional

9     challenges.

10         THE COURT:  You want additional challenges?

11         MR. SHARGEL:  We would like, if it pleases the

12    Court, one additional challenge for each one of the

13    defendants.

14         THE COURT:  I don't know whether I can give you

15    that much.  If I do that, I would balance it out by giving

16    the government some additional challenges.  That requires

17    consent.

18         MR. SHARGEL:  The rules says --

19         THE COURT:  I can condition your request on your

20    consenting to the government being given some additional

21    challenges also.

22         Why don't you talk to each other.

23         MR. SHARGEL:   15 seconds.

24         MR. SHARGEL:  We are not going to consent, and say

25    10 and 6.

1          THE COURT:  Absent consent.

2          MR. SHARGEL:  That is correct.

3          THE COURT:  It may not be reversible error but I

4    don't want to deal with it on that basis.  Let's stay

5    10 and 6.

6          When we qualify people we'll have them all in the

7    courtroom, and then you'll make peremptory challenges against

8    the group of 28, and we'll be left 12 jurors.

9          MR. SHARGEL:  Assuming six alternates, we need 40.

10         THE COURT:  We have some chase.  My thinking is

11   first get the jury and then we'll go through the process with

12   the alternates.

13         I think it is easier because you are dealing with

14   28, which is enough.  We'll do the alternates after that.

15   Sometimes we even get agreement on the alternates from a

16   group of 28.  We'll see about that.

17         We're pretty much squared away with that.  I guess

18   it will take us a few days to go through that selection

19   process.

20         Let's move that to one side.  Let's hear your

21   housekeeping concerns.  We'll see whether they might coalesce

22   with some of my concerns.

23         One, I alerted your Honor to the fact that we're

24   having some difficulty with the 3500 material.  Following the

25   letter I submitted to your Honor, the government has agreed,

1      and I think you got a letter reflecting this, from our

2      office, that the government has agreed to bear the cost of

3      coping the 3500 material.  That's not the problem.

4              The problem is, the government has chosen a method

5      of producing the 3500 material that is somewhat unorthodoxed.

6      That is, at the time they think the 3500 material should be

7      produced, it is produced.  Instead of being produced to the

8      defendants, it is produced to First Choice Copy.  After the

9      government in this case, in this first wave of 3500

10     material -- I didn't mean to say in this case -- in the first

11     wave of 3500 material, after the government gave First Choice

12     Copy the green light to give us the 3500 material, I waited

13     nearly a week to get the material.  That's just unacceptable.

14     It is like in the case where the government is not producing

15     all the 3500 material at once and is choosing to produce it

16     in waves.

17             At the time that it is going to be produced, we

18     need to have it and have it that day .

19             THE COURT: How much have you received?

20             MR. SHARGEL:  We received two witnesses.  One is an

21     expert witness with prior testimony, Agent Hagerty, with

22     prior testimony.  Another is a cooperating witness named

23     Michael D'urso with a good amount of 3500 material.  A couple

24     thousand pages, I would estimate, and to get this delayed --

25     the statute is specific.  The Jencks case is specific.  The

1   government has to produce it.  If they know that they were

2   going to produce something next Monday, it is not give it to

3   First Choice next Monday.  Give it to the defendants next

4   Monday.  We'll come down here and pick it up.

5           THE COURT: Mr. Genser, what is going on here?

6           MR. GENSER:  Judge, the statute says that we don't

7   have to produce 3500 material until after the witness

8   testifies.

9           THE COURT:  We know that.  I am just going to

10   adjourn the case and we are going to wait for weeks before we

11   start the trial.  We all understand in the realistic world

12   that it is not going to happen that way.

13           MR. GENSER:  Judge, as Mr. Shargel alluded to,

14   there was a voluminous quantity of copying that needed to be

15   done.  Our office just didn't have the resources to do it.

16   We out-sourced it to First Choice.

17           THE COURT:  There is nothing wrong with that.  The

18   problem is counsel is not getting the material --

19           MR. GENSER:  It seems like he has received it.  It

20   is still several weeks before any witnesses are going to

21   testify.

22           THE COURT:  Give me a realistic sense of what we

23   are talking about.  How much more has to be delivered, really

24   delivered to counsel?

25           MR. GENSER:  To the extent that we have witnesses

1  that don't have that volume of 3500 material, we'll do the

2  copying in-house and send it directly to the defense.  To the

3  extent it is too much for us to handle in-house, we'll

4  out-source and endeavor to do it so that there is sufficient

5  lead time so that they get it when we would otherwise have

6  turned it over.

7          THE COURT:  You are going to have expedite your

8  efforts.  What I will do, I have no way of really micro-

9  managing this nor do I have the inclination to do that.  This

10  is the type of thing which rely upon the good faith efforts

11  of professional counsel.

12          If there is a snag, then I am just going to hold up

13  the start of the trial.  I will let you know right now.  I

14  can't make that judgment as I sit here today.  That will be

15  the consequence.

16          MR. SHARGEL:  Keep in mind that's what they want.

17          THE COURT:  Not a question of fault.

18          MR. GENSER:  Absolutely, Judge.  We turned this

19  material over.  I think at the time we turned it over, it was

20  more than a month before trial was going to start.  We are

21  endeavoring to get this stuff to them.

22          THE COURT:  You made available to the defendant, I

23  understand from what I hear, there is a need for First Choice

24  to reproduce this.  It takes a period of time.  I am not

25  suggesting you acted in bath faith.   I am saying we have to

1      realistically effectively do better.

2                    MR. SHARGEL:  One more thing.  It has been my

3      experience with the prosecution in this district and in fact,

4      with Mr. Genser.  I don't see why it should be a problem what

5      I am about to suggest.

6                    Obviously we don't them have a witness list in the

7      case.  Obviously there are going to be other cooperating

8      witnesses.  If history is any teacher, we can expect there

9      will be cooperating witnesses who have testified in other

10     trials.  We're talking about hundreds if not sometimes

11     thousands of pages.  Right now I can have no complaint

12     because Mr. Genser appropriately points out that we have a

13     fair amount of time before Mr. D'Urso takes the stand and

14     there's adequate time to review the material.

15                    I cannot get 3500 material in a carton on a Monday,

16     and have the government say, it won't be two weeks -- two

17     weeks will go before that witness appears.  In the middle of

18     trial, your Honor knows full well I can't spend time reading

19     thousands of pages.

20                    THE COURT:  I understand that.  Unless you clone

21     yourself you are not going to be able to do both chores at

22     the same time.

23                    MR. SHARGEL:  Correct.

24                    THE COURT:  Be mindful of that.

25                    MR. GENSER:  We will.

1          MR. SHARGEL:  I would think those witnesses who are

2     cooperating witness with the Witness Protection Program,

3     there is no reason it can't all be turned over now.

4          THE COURT:  Let's do that this week if you can do

5     that.

6          What will happen is, rather than to put counsel in

7     this impossible position of having to employ full energies

8     and mental capacities to deal with the case as it is

9     unfolding and at the same time have to review voluminous

10    documents, even though the witness may not be called for two

11    weeks, I am not going to put them in that type of position.

12    I will adjourn the trial to give them the opportunity to

13    spend whatever time they need to review that material.  That

14    is the fairest thing to do.  I can only do one thing at a

15    time.

16         MR. GENSER:  As Mr. Shargel acknowledges, he is

17    raising issues but also acknowledging we have responsively

18    turned the material over to him sufficiently in advance.  We

19    are going to continue to do that.

20         THE COURT:  I will monitor this thing and I am just

21    giving you a word of caution that I will not hesitate to send

22    the jury home after the trial starts for some indeterminable

23    period of time if I find defense counsel is being

24    overburdened with the need to be able to absorb large volumes

25    of papers.

1    MR. GENSER:  Understood.

2    THE COURT:  Act accordingly.

3    MR. SHARGEL:  Next item.  We're requesting the

4    Court order the government to supply in the next several days

5    or a week at most --

6    THE COURT: John Does.

7    MR. SHARGEL:  No, I am not there.

8    A document list, a list of documents they intend to

9    introduce in their chase in chief.  I am not suggesting they

10   are bound by the list or they can't add a document.  It will

11   be necessary for the orderly trial process to have copies of

12   the documents that they are going to introduce in their chase

13   in chief.  We've gotten many, many documents.  We have no

14   idea what they are actually putting in now.  To have those

15   exhibits premarked so if an exhibit is offered -- let's think

16   about the practicalities of it.  If an exhibit is offered, we

17   have to go on an easter egg hunt to find the exhibits.  All

18   counsel have to get together, could I see a copy, could I see

19   a copy.  It will take forever to get a document in evidence.

20   The government should prepare the universe of

21   documents it intends to introduce, mark the documents and

22   deliver those documents to the defense.  This way when they

23   say Government Exhibit 75, everyone at the table will know

24   what Government 75 is.

25   THE COURT:  Makes perfect sense.  I usually get an

1    exhibit list in advance of the trial.  I would like to have

2    this significantly in advance of this trial because of the

3    obvious numerosity of people and personalities.  I think you

4    could accommodate me and defense counsel as well in that

5    respect.

6              MR. GENSER:  Yes, Judge.  We're preparing our

7    documents and marking our exhibits and compiling our lists

8    and we are going to turn them over just as soon as we can.

9    We expect that to be soon.

10             THE COURT: Give me a little more specifics than

11   that.

12             MR. GENSER:  We are going to try and do it this

13   coming week.  That's more specific.

14             THE COURT:  I could hopefully have a list from you

15   by the end of this week.

16             What do you anticipate in terms of the number of

17   actual documents you want before the jury?

18             MR. GENSER:  I don't think it is going to be a

19   document-intensive case, judge.

20             THE COURT:  It doesn't sound like that to me.  You

21   have a list of tapes and transcripts already in place for

22   that.  You could turn that over specifically, I guess, right?

23             MR. GENSER:  Judge, we have turned over as...

24             THE COURT:  I call it the ones you plan to use.

25             MR. GENSER:  What we have done is turned over a set

20

1  of excerpted transcripts that include those that we intend to
2  use.  We're still in the process of narrowing that down.  We
3  hope to narrow it down further.

4          THE COURT:  Do that.  I am also interested in my
5  capacity to hopefully intelligently manage the trial by
6  having a chance to look at those excerpts in advance of the
7  trial too.

8          So you serve dual purposes.  One, fairness to the
9  defense counsel and fairness to the Court.  Get them as
10 quickly as you can.  Try to move the process along by having
11 those documents which you have come to peace with identified
12 and transmitted to me by the end of next week.  Counsel as
13 well, of course.  At least we'll be moving along in that
14 process.

15         MR. GENSER:  Judge, I think we can accelerate the
16 process if we are permitted to do it sort of in waves.  In
17 other words, what we have ready we can do.  It may take a
18 little while longer to get to the final list as it were for
19 what we are going to be using towards the end of the trial.

20         THE COURT:  I will have a sense as to whether the
21 government is making its best good faith efforts in terms of
22 doing common sense things.  Let's have a good wave come in a
23 few days.

24         MR. GENSER:  Let me assure the Court we're not
25 holding back on anything.

1          THE COURT:  It is not --

2          MR. GENSER:  Doing as best we can.

3          THE COURT:  I am not casting blame on you.  I am

4  just practically managing the case in a sensible way.  Don't

5  really feel that you have to be defensive or suggesting

6  anything other than good faith on the part of the government.

7  Notwithstanding good faith, certain things have to be

8  accomplished in order to have an orderly effective trial.

9  That's all I am telling you.

10         MR. GENSER:  Thank you, judge.

11         THE COURT:  Let me see good progress by the end of

12  next week.

13         MR. SHARGEL:  Judge, with all respect, I don't

14  think that is workable when it comes to the tapes and the

15  transcripts.  I think that the defense needs to know before

16  the trial starts or at the time the trial starts what tapes

17  the government is going to introduce in its case in chief.

18         THE COURT:  I think that's a fair request.

19         MR. SHARGEL:  I want to give you another reason, if

20  I may.  There may be evidentiary objections that should be

21  made in limine.  It is impossible to do that if we are going

22  to be told a day before or two days before tapes are going to

23  be played.

24         THE COURT:  This is not going to happen that way.

25  Mr. Genser is not suggesting that either.  The conversation

1    we're having right now is somehow general.  We'll get more

2    focused and specific if needs be.  For present purposes we

3    understand each other.

4              I expect to see a lot of things happening next

5    week.  Try by the end of Thursday because I am going to be

6    away the following week.  This way I will have some reading

7    material to take with me to Puerto Rico.

8              MR. SHARGEL:  As a practical matter with regard to

9    the transcripts the government is going to be producing,

10   could we have that sent directly to the defense rather than

11   First Choice?

12             THE COURT:  That part you could send directly to

13   them I am sure.

14             MR. GENSER:  All right, judge.

15             THE COURT:  Also, you are going to want to husband

16   your energies because you want to be effective before the

17   jury.  You don't want to overburden them and things of that

18   nature.  After a while sometimes it becomes counter

19   productive in terms of the juries impatience.  You want to

20   make an effort to help the jury as well.

21             Okay.

22             MR. GENSER:  Yes.

23             MR. SHARGEL:  There is only one point I have.  Your

24   Honor received, I think the day before yesterday, on

25   Wednesday, the government's motion which was titled 404(b) to

1    admit certain evidence pursuant to 404(b) and other in limine

2    application.

3              THE COURT:  I hadn't seen that before yesterday.

4              MR. SHARGEL:  I want to answer that in writing.  I

5    want until January 6, perhaps or even the week after.

6              THE COURT:  I have a lot of material to deal with

7    here today.  When did you send the 404(b) letter to me?

8              MR. SHARGEL:  Wednesday.

9              MR. GENSER:  I think it was one week ago.

10             MS. JESTIN:   I think Monday.

11             MR. GENSER:  It was Monday, yes.

12             MR. SANTANGELO:  I got it Tuesday.

13             THE COURT:  I am glad you told me that because I --

14             MR. GENSER:  I believe it was hand delivered to

15   Mr. Shargel on Monday afternoon and FedExed to the rest of

16   defense counsel on Monday and hand delivered to your Honor's

17   chambers on Monday.

18             THE COURT:  We'll find it.

19             MS. JESTIN:   Let us know if you can't find it.

20             THE COURT:  Just double-check.   I have my law

21   clerk here, so I am going to tell them right now:  Find the

22   404(b) letter as quickly as you can.  Okay.

23             How much time do you need?  You said until January

24   6?

25             MR. SHARGEL:  We have a lot deal with.  I am going

1  to ask for the end of that week.  I don't think actually --

2  mid-week January 8th.

3          THE COURT:  Try to flush it out during the jury

4  selection week.  Of course you can have until, what, January

5  8?

6          MR. SHARGEL:  January 8.

7          THE COURT: Anything else.

8          MR. SHARGEL:  That's all I have.

9          THE COURT:  From the government's perspective, any

10  administrative matters you want to address?

11          MR. GENSER:  Just to the extent the defense has

12  documents or exhibits they intend to be offering, we have not

13  received any reciprocal discovery whatsoever.  I would ask

14  for the same consideration.

15          MR. SHARGEL:  We understand our obligation under

16  Rule 126, and we will comply.

17          THE COURT:  Fair enough.

18          MR. GENSER:  I am not sure if that is exactly what

19  I asked for.

20          MR. SHARGEL:  With the same consideration.

21          THE COURT:  I will be monitoring it all.  All

22  right.

23          So far so good.

24          Now we have a slew of motions.  Let me first

25  address what I have labeled the general motions.  Of course,

25

1    it is understood that all defendants join in on all these

2    motions.  I think that is basically the process we have

3    adopted.  You have no need to be concerned about whether your

4    rights are being preserved as far as the record that we will

5    be making in this case.

6            I have a general boilerplate request for a bill of

7    particulars.  Is there any need that I have here to really

8    address anything about that?

9            I don't think so.

10           I have the Brady request again.  These are general

11   matters.  I think we have spoken about them.  I don't think

12   we have to do anything further today.  I have a notation

13   about the 404(b) notice.  We spoke about that.

14           I listed something about the request that the

15   government produce certain individuals in Court to commit

16   permit defense counsel to conduct interviews.  Is there

17   anything I need to address in terms of that?

18           MR. SHARGEL:  Mr. Levitt has that motion.

19           THE COURT:  The standard is, of course, defense

20   counsel should have the opportunity to have access to

21   witnesses and to question them.  Of course, there are limits

22   to what you can say to each other in respect to all of that.

23   Certainly, defense are entitled to have access to prospective

24   witnesses by the government.

25           What do you wish to say in that respect?

1              MR. LEVITT:   If I could backtrack for a moment.

2    With respect to the Brady issue, we had addressed

3    specifically a Brady letter sent to the defense by the

4    government dated July 24th.   In that letter, the government

5    suggested that under Brady there are certain witnesses to

6    whom we may wish to speak without providing us any additional

7    information besides the name.

8              Your Honor knows from the motions that we have

9    filed that we have endeavored to speak to the persons on that

10   list essentially without success.

11             The government has --

12             THE COURT:   They don't have to speak to you.   They

13   have to certainly --

14             MR. LEVITT:   Certainly not.   Since they haven't

15   spoken to us, we don't have access to their testimony.   The

16   government is privileged to information that suggests these

17   people possess Brady evidence.   We therefore ask the

18   government be required to turn over whatever documentary

19   evidence they have.

20             THE COURT:   I don't know whether the government

21   knows about anything these people may have at their disposal.

22             MR. LEVITT:   I don't mean what they possess but,

23   rather, the government possesses in the way of 302s or other

24   documents that reflect the type of information to which the

25   government is privileged which led them to write the Brady

1    letter in the first place.

2              THE COURT:  Do you know what Mr. Levitt's concerns

3    are here, Mr. Genser?

4              MR. GENSER:  The government's position is, we have

5    complied with the dictates of Brady by alerting the defense

6    to the identities of individuals who have potential Brady

7    material or who may have potential Brady material.

8              THE COURT:  If you know that there is such

9    material, do you not have an obligation to disclose that?

10             MR. GENSER:  First let me just state that we are

11   aware that there is some information which they may consider

12   to be potentially Brady material although we may not credit

13   the information.

14             THE COURT:  Sometimes there is a gray area.

15             MR. GENSER:  Exactly.  That's why we have alerted

16   them to the identities of the individuals.  They are free to

17   subpoena those individuals and call them as trial witnesses.

18   I don't think our obligation goes beyond that.

19             THE COURT:  It seems to me -- I am just talking

20   conceptually here;  you know more about these people than I

21   do obviously.  It seems to me conceptually, if you know there

22   is a particular document that you are aware of, even if it

23   arguably is not physically in your possession, if that's what

24   we are talking about --

25             MR. LEVITT:   What I am talking about, your Honor,

1    is the following.  The government interviews certain persons

2    either through the government attorneys or the FBI.  They

3    generate a report, a 302, in the instance of some, maybe

4    internal memo in the instance of another, which reflects the

5    statement of a person out there which is exculpatory as to

6    our clients.

7            It is our position that because we can't speak with

8    these persons, it is not practical for the government to say,

9    well, you can subpoena these people and have them testify

10   cold.  In the real world it doesn't work that way.  We have

11   endeavored to speak with these people who may be possessed of

12   Brady-type evidence.  They have declined to talk to us. They

13   may have it in their file.  The government may have.

14           THE COURT:  I don't understand something here.  If

15   the government has in its file any document at all that could

16   be exculpatory, the government has an obligation to turn that

17   over.  What am I missing here?

18           MR. GENSER:  Judge, I think that our obligation

19   under the law and the dictates of Brady is satisfied.  If a

20   witness has information which may be viewed by the defense as

21   helpful to them, the cases are fairly clear that we satisfy

22   our obligation by --

23           THE COURT:  I am not talking about that.  I am

24   talking about if you have any documents or information that's

25   written down that could arguably be exculpatory.  Don't you

1   have an obligation to turn that over?

2            MR. GENSER:  I guess we're going in a little bit --

3            THE COURT:  We have --

4            MR. GENSER:  -- of circles with that --

5            THE COURT:  Things to do today.  If there is any

6   document you have at all that arguably could be viewed as

7   exculpatory material, I am not talking about Giglio, but

8   certainly if you have a problem, you send it to me in camera

9   and I will look at it and decide whether to turn it over.

10  We want to avoid post-verdict Brady motions.

11           MR. GENSER:  May I make a suggestion.  We will

12  prepare a letter that summarizes the substance of any

13  statement to us that might be viewed by the defense to have

14  been exculpatory and identify who made the statement.

15           THE COURT:  Okay.

16           Let's do that.

17           MR. GENSER:  Otherwise we will get into the whole

18  issue of redacting portions that don't qualify under Brady.

19           MR. SHARGEL:  That's wholly unsatisfactory.  I

20  object to that.  I make a constitutional objection under

21  Brady v. Maryland or Giglio if they have information.  They

22  can't be the people who decide what's helpful or what fairly

23  summarizes.

24           THE COURT:  I will look at it.  I don't want to

25  really engage in prolonged debate here.  I don't quite

1   understand.   If there is a cat and mouse situation or

2   whatnot, the way we cut through it all, you send to me

3   everything you have in writing that arguably in your opinion

4   could be deemed exculpatory.   I will look at it.   If you

5   can't comfortably turn it over because you are concerned

6   about the need to redact or whatever, you let me know.   We

7   are making a record here that could come back to haunt you if

8   there is a conviction.   I just alert you to that right now.

9   You are going to have make sure that doesn't happen if you

10  want whatever conviction that may be obtained to be upheld.

11          MR. GENSER:   On that note, I believe that the

12  constitutional dictates of Brady does put the onus on the

13  government to actually sift through the material and select

14  and identify that which might be Brady.   To suggest that we

15  should then open our -- I am not sure the Court truly wants

16  us to open all of our files for the Court to review every

17  document we have.

18          I think my suggestion would be let us prepare our

19  letter and see if that satisfies the defense.   If they have

20  some other concerns or some follow-up requests for something

21  concerning a witness.   We'll address it at that time.

22          MR. SHARGEL:   Could I say one thing to round out

23  the record on this.

24          I understand it is the government's burden to go

25  through its file and select Brady.   I am not asking for open

1    file discovery.  That is not the point.

2          What I hear Mr. Genser saying:  he is going to

3    write a letter and he is going to summarize the Brady

4    material.  In other words, he has already identified a

5    document that qualifies as Brady material but instead of

6    turning over the document either to the defense or at least

7    to the Court, he is going to summarize what it is that is in

8    the document.

9          I am not satisfied with his summary.  Either he

10   turns it over or if he has some question about it, he turns

11   it over to the Court.

12         THE COURT:  Look, I don't know how large a list you

13   are talking about.  Why don't you start in that direction.

14   At least we've identified material.  Let's see how large a

15   list it is.  You think about things as a result of this

16   little dialogue we are having in Court today.  My sense is

17   that when I look at that list, we will see how large it is.

18         If there is -- may just call upon you to produce

19   it?  Let me look at it if you have a problem.  You consider

20   this, okay.

21         MR. GENSER:  Yes, we'll consider that.

22         MR. LEVITT:   When will that be done?

23         THE COURT:  Obviously we want everything done

24   quickly.  That's why we are meeting here today, to give us

25   time before January 6 to do all those things.

1          I know you folks have a lot of work to do.  I
2     realize that.  There is no reason -- you tell me how much
3     time do you think this will take?
4          MR. GENSER:  To prepare a list of the materials.
5     We can do that quickly.
6          THE COURT:  All right.  Do that quickly.  Think
7     about whether you will turn over any of this material to
8     counsel and indicate what material you feel that you do not
9     want to turn over to counsel.  I will be looking at that.
10    You make the selection process.  I mean it is the
11    government's responsibility, but I think that we will all
12    well-served if you are very well-focused on all of this.
13    Okay.
14         MR. LEVITT:   Can that be done next week, your
15    Honor?
16         THE COURT:  Well, as compared to the week after
17    that?
18         MR. LEVITT:   Sure.  Precisely.  If in fact this
19    discloses things we have to follow up on, it is going to be
20    difficult as a practical matter.
21         THE COURT:  I understand.  I am advised the trial
22    is going to last more than a couple of days.
23         MR. GENSER:  We'll do that.   We will identify the
24    items and even summarize, go beyond what the Court has asked.
25         THE COURT:  If you can do that by the end of next

33

1  week.  I know we have Christmas day.  I want people to enjoy

2  the holiday.  I understand that.  Make your best efforts to

3  get it done by the end of next week.  If there's any follow-

4  up problems, get back here on January 6.  We'll focus on that

5  during that week.

6          MR. GENSER:  Yes, your Honor.

7          THE COURT:  Anything else?

8          MR. GENSER:  We had next asked your Honor with

9  regard to producing in Court informants who are under the

10  control of the government for the defense to quash --

11          THE COURT:  You want an opportunity to speak to

12  them to see whether they will talk to you.  How many people

13  are you talking about?

14          MR. LEVITT:   The government would know.  I

15  wouldn't.

16          MR. GENSER:  Our response to that request was that

17  we don't have informants that won't -- if we do have

18  informants, they will be witnesses that will testify.  So

19  under the rule of Rosario and Saa, there is no obligation to

20  identify them and grant them interviews pretrial.  I am not

21  sure what the request is directed to.

22          THE COURT:  I will give you an opportunity during

23  the course of the trial to speak to these people.

24          MR. LEVITT:  Prior to the testimony, we'll have

25  that opportunity?

1          THE COURT:  We'll see how it works.  These people

2    could come into Court before they testify.  We'll see whether

3    we'll give you a chance to talk to them.  How does that

4    sound?

5          MR. GENSER:  It is a fine, judge.

6          MR. LEVITT:   If we could do that in a timely way.

7    If it doesn't happen until after their testimony, it is

8    obviously irrelevant to us.

9          THE COURT:  I am not going to march them in here

10   right now.  I don't know who these people are.

11         MR. LEVITT:   I don't either because they haven't

12   told us.

13         THE COURT:  It is a little premature to do that

14   now.  We'll monitor that.

15         What else?

16         MR. SHARGEL:  I have nothing else for today, judge.

17         THE COURT:  Let's turn to the focussed motions.

18   Let's take Peter Gotti's first.

19         I have the motion to suppress the FBI wiretap and

20   FCI McKean.  I reduced that to a written format.

21         MR. SHARGEL:  We have received that.

22         THE COURT:  The rest of these, I am going to

23   dispose all of this in Court today.  Why did I put that in

24   writing?  I thought it was valuable to husband this

25   information and cobble it into something in written form.

1          Are there any Peter Gotti motions out there that I

2    may not be aware of?

3          MR. SHARGEL:  We made the motion with respect to

4    timely production of the Brady based on --

5          THE COURT:  We discussed that just now.

6          MR. SHARGEL:  Right.  Beyond that, there is nothing

7    else.

8          THE COURT: All right.

9          Mr. Shargel, unless there is something else you

10   wish to bring to my attention, why don't I ask Mr. Cassarino

11   to step forward while I address his motions.

12         Mr. Levitt.

13         Apparently Mr. Cassarino is behaving himself on his

14   release, which I am happy to see.  I heard nothing to the

15   contrary from anybody else.  How is his daughter doing?

16         MR. LEVITT:  Doing well.  There have been some

17   issues concerning the next stage of the surgery.  They had to

18   wait a while.  Obviously it is going to be happening

19   fortunately, and we are very optimistic.  Thank you.

20         THE COURT:  Once again, the written decision I

21   rendered embraces Mr. Cassarino's suppression motion as well.

22   You have that ?

23         MR. LEVITT:   We do.

24         THE COURT:  I want to discuss a little bit your

25   application to dismiss racketeering acts 23 to 30 and 49 to

1    65 for lack of specificity or in the alternative to require

2    the government to identify John Does 12 through 8.

3              I believe that the indictment is properly pled.    I

4    have no problem with the specificity.  Let's focus on the

5    John Does.  When do you think counsel should know the

6    identity of these people?  As I read your papers, you sort

7    have taken the position you really have in effect identified

8    these people, that you have given so much information from

9    the government that they should be able to figure out or to

10   discern who these people are.  My concern is if that's the

11   case, you know it is not that you are not disclosing these

12   people, you are just making it little more difficult and

13   requiring defense counsel to spend perhaps an excessive

14   amount of time to get to ultimately where they should be

15   entitled to get.  Why can't you just tell them who they are

16   instead of require them to have to sift through all the

17   papers?

18             MR. GENSER:  Judge, perhaps after this status

19   conference I can speak with defense counsel and identify the

20   individuals.

21             THE COURT: I direct you to do that based upon that.

22   I was going to direct Mr. Genser to do that because you have

23   disclosed these people in effect.

24             MR. GENSER:  I think they already know who they

25   are.

1          THE COURT:  Be specific about it so there could be

2     no possible mistake.

3          MR. LEVITT:  If I can add to the record in fact

4     another member of the government team has disclosed that to

5     us.

6          THE COURT:  You are fine with that?

7          MR. LEVITT:  I am fine with that.  The only thing

8     that hasn't been disclosed is the identity of the person who

9     supposedly or whose potential testimony supposedly was

10    obstructed in the obstruction of justice charge.  I assume

11    the government is willing to give me that.

12         MR. GENSER:  I think we revealed that previously,

13    Richard Bondi's stepson Anthony Frizetta.

14         THE COURT:  This is the way we should go about our

15    business.  We're having this colloquy in Court and we are

16    able to satisfy people's concerns rather than to have

17    excessive paperwork.

18         Anything else?

19         MR. LEVITT:   No, your Honor.

20         THE COURT:  Let me speak to Mr. Ciccone's lawyer

21    now with respect to his motions.

22         MR. MITCHELL:  John Mitch.  I am going to appear on

23    this.

24         THE COURT:  I have a host of things you have raised

25    on behalf of Mr. Ciccone.  Let me see whether I have them all

1  itemized correctly.    You let me know if I missed anything.
2  All right.

3        I move to dismiss Count One, the racketeering
4  conspiracy count, because you claim it is based upon improper
5  theory of vicarious liability and/or is duplicative.

6        I don't believe that that is correct.    There are
7  two branches to that apparently.

8        MR. MITCHELL:    Your Honor, if I may quickly, to
9  summarize it.    The problem I have with these sort of
10  monolithic 1962 (c) counts, the law is clear each defendant
11  commits his own 1962 (c) violation.    He is not vicariously
12  liable for the racketeering acts that are committed by
13  others.

14        THE COURT:    Nobody is suggesting that he is.

15        MR. MITCHELL:    The indictment, most respectfully,
16  does.    If you look at the count, it talks about single
17  pattern of racketeering act.    There is not a "single," there
18  is nine, because each individual defendant has to commit his
19  own pattern.

20        THE COURT:    I don't agree with that.    Look, the
21  indictment is pled exactly the way all these racketeering
22  indictments are laid out.    We know the jury is going to have
23  to assess the criminal culpability of each defendant.    We
24  know that in Count One they all join together in terms of
25  being charged with a conspiracy to engage in racketeering

1   activity and that it is part of an enterprise, and they are

2   going to, of course, be kept to discrete racketeering acts

3   that apply to them.   We have predicate acts.  It is in the

4   indictment.  It is all alleged in the indictment.

5           MR. MITCHELL:   Most respectfully, Second Circuit

6   has said it:  You can't treat a 1962 (c) count as RICO

7   conspiracy.

8           That's precisely what they are doing.

9           THE COURT:  No, no, no.  What you are suggesting is

10   you carve out and separate a RICO conspiracy count in respect

11   to each individual defendant.

12           MR. MITCHELL:   No, sir.  What I am saying you have

13   the substantive RICO, the 1962 (c).  Then you have RICO

14   conspiracy 1962 (d).  The problem is each individual person

15   must commit a discrete 1962 (c) violation.

16           THE COURT:  That's right.

17           MR. MITCHELL:  Must have his own pattern of

18   racketeering activity.  What you had in Count One is nine

19   separate discrete 1962 (c) counts, nine different crimes

20   charged in a single count.  There is no explanation offered

21   as to how that couldn't be duplicitous other than the

22   argument argued in the brief:  This is the way we always do

23   it.

24           The fact is they don't offer a single explanation.

25   They point to 108(b) to say somehow it justifies.  It

1    doesn't.  They point to the decision in United States v.

2    Hickey where the question wasn't even raised.  For the life

3    of me, most respectfully, how can you have nine separate

4    crimes charged in a single count?

5              THE COURT:  I don't think there is nine separate

6    crimes.  There is an overarching criminal conspiracy here.

7              MR. MITCHELL:  That's the second count, RICO

8    conspiracy count.  The first count is a substantive count.

9              THE COURT:  Mr. Genser, what do you say about that?

10             MR. GENSER:  Judge, I think we're all familiar with

11   indictments and counts in indictments that charge, let's say,

12   ten or twelve or even twenty individuals with participating

13   in the same crime.  Each of those individuals, even though

14   they are named in the same count, is charged in a separate

15   crime. So there is no duplicity, as my colleague suggests.

16             I think your Honor is absolutely correct, there is

17   no flaw in the way this indictment is pled.  The indictment

18   specifically states that each defendant committed two of the

19   acts and so it is clear we are talking about a separate

20   pattern for each defendant.  It is simply a matter of

21   drafting --

22             THE COURT:  The jury is going to be properly

23   charged, and certainly you have sufficient knowledge as to

24   what the alleged crime is that your client is being charged

25   with.  I have no problem with that.  What you are proposing

1    would just produce multiple additional pieces of paper

2    without any real substantive value to that.

3              MR. MITCHELL:  Here is the problem.  The problem

4    is, when you read the indictment as a layperson, indeed, if

5    you read it as an experienced person --

6              THE COURT:  I am not sure the jury is going to be

7    reading the --

8              MR. MITCHELL: The allegation will be given.  It

9    suggests a single monolithic 1962 (c) substantive count.  It

10   suggests all the defendants are guilty of the pattern of

11   racketeering activity that's pled.

12             THE COURT:  Let me suggest this.

13             The motion is denied.  The jury is going to be

14   properly charged.  It is more of a charging issue than,

15   really, a pleading issue.  The jury may not even see this

16   indictment.  I am not necessarily going to give it to them.

17   I am not exactly sure how I am going to husband all this

18   information, but I am going to do it in a way so the jury can

19   hopefully understand what this is all about.

20             I may not track the indictment.  I generally don't

21   give the jury the indictment.  We deal with that when it

22   comes to charging the jury.  All right.

23             THE COURT: Let's go on to address -- count two I

24   think falls in the same broad category.  I am satisfied.

25             MR. MITCHELL:   The problem with Count Two, your

42

Honor, 1962 (d) makes it a crime to conspire to commit a 1962 (c) violation.  The problem is the second count says that the defendants are guilty of RICO conspiracy because they conspired to commit the 1962 (c) violation set forth in Count One.  The problem with that is there isn't one of them. There is nine of them.

THE COURT: What's wrong with that?

MR. MITCHELL:  That's nine conspiracies in one count, your Honor.

THE COURT:  Once again I think it is going to be a charging issue really, not an indictment issue.

All right.  I looked over the indictment.  I think it is properly pled.  I think it is necessary to join a multiple number of defendants in respect to these crimes in counts one and two.  Otherwise, we have a 200-page indictment which would make it more difficult for the Court to absorb than already is the case.

You have your record.  Your motions are denied in respect to those two issues.  I am more troubled by the third branch of your motion to dismiss Racketeering Act 23 because the subpredicate act 23 (c) does not qualify as a racketeering act.  Also to dismiss racketeering acts 31 and 32 and count 66 and 67 for failure to allege all of the necessary elements of the offense under state law.

I am less troubled with racketeering some predicate

43

23 (c).  I am a little more troubled with 31 and 32 and count
66 and 67.  I think 23 (c) is properly pled.

It is the extortion conspiracy and attempt in
connection with the efforts to deprive John Doe one, who we
know who that is, an employee of Holland Hook Container
Terminal.  Count 23 (c) brings with it the same conduct under
the state law theory of --I should say 23 (c) cites
specifically to New York Penal Law Section 110 which is a
1155.50, which is larceny by extortion and 155.40, which is
grand larceny in the second degree.  The only thing missing,
it doesn't set forth the specific elements of those sections.
Is it your position that the indictment is fall at this --

MR. MITCHELL:  Yes, sir.

THE COURT:  -- because you are claiming that the
state statutes are not set forth in terms of their particular
elements.

MR. MITCHELL:  Yes, sir.  I think now that's
functionally the law of the Second Circuit after United
States v. Cirrillo.  It is also the thrust of the decision in
United States v. Miller.

THE COURT:  Wait a second.  Go slow.

Look, the law is clear in the Second Circuit under
Arena and under Cirrillo that you don't have to --

MR. MITCHELL:  Those cases are not the law anymore
in the circuit.

44

1          United States of Cirrillo -- C-i-r-r--

2          THE COURT:   That's why I mentioned you read

3     Cirrillo.  Cirrillo says Arena is no longer good law.

4          THE COURT:  Cirrillo makes it perfectly clear that

5     for purposes of RICO predicate acts you only need to have the

6     generic definition of the underlying state crime.  Cirrillo

7     does not say, as you contend, that you have to allege the

8     specific elements of the state crime.

9          I read it carefully.  I don't agree with your

10    assessment.  Your motion is denied with respect to 23 (c).

11         MR. MITCHELL:  May I say one other thing?  The

12    reason why the state elements are necessary in the

13    overarching federal crime is because even if you refer to a

14    statute such as Penal Law Section 212, whatever it is, you

15    don't have any guarantee that's what the grand jury

16    considered.  The grand jury obviously --

17         THE COURT:  You are mixing, with all due respect,

18    apples and bananas.

19         We are going to talk about counts 66 and 67 in a

20    short period of time.  We are right now talking about a

21    RICO --

22         MR. MITCHELL:   Here is the reasoning.  The fact

23    is, 23 (c) would be a misdemeanor under state law if it was

24    an attempt to commit a generic extortion.  The government

25    says it is not a misdemeanor but a felony because there is a

1    specific extortion statute which is one step above the lowest

2    felony and state law and therefore an attempt to commit it is

3    a felony as well.

4          The fact is the only way that you know what the

5    statute -- state statute they say he violated is a reference

6    to the --

7          THE COURT:  Let's talk about the substantive count.

8    Let me read to you from Cirrillo just so we have effective

9    dialogue.

10          The Court references Arena which wasn't overruled

11    by saying that, there we stated that only a generic definition

12    of an underlying state crime is required in a RICO indictment

13    as distinguished from the elements of the penal codes of the

14    various states where acts of racketeering occur.

15          The Court in Cirrillo goes on to make it perfectly

16    clear that while a generic definition is sufficient for

17    purposes of pleading a RICO predicate count, indeed the

18    government will have to establish and prove at the trial the

19    requisite element under the state law.

20          That's the law of the Second Circuit.  I don't

21    agree with your assessment.

22          MR. MITCHELL:  Most respectfully, your Honor, I

23    don't think that Cirrillo ever focused on the grand jury

24    question.  It simply can't be.  If it is an element of the

25    offense, it can't be it doesn't need to be charged.

1           THE COURT:  I made a record.  I disagree with you.
2    Sometimes I am wrong but --
3           MR. MITCHELL:  It goes back to Russell and all
4    those cases.
5           THE COURT:  It is an important thing to make the
6    record, and I will make my ruling.
7           I am more interested here where I am going to put
8    pressure on the government attorneys to talk about the RICO
9    predicate acts 31 and 32 as well as the substantive count 66
10   and 67.
11          Mr. Genser, in going through the indictment, I am
12   puzzled about a few things.  Bearing in mind what I just
13   announced as the law for proper pleadings of RICO predicates
14   and subpredicates, turn, if you would, to 31 and 32.
15          That is going to be at page 35 of the indictment.
16   Do you follow with me?
17          You are alleging there is a predicate illegal
18   gambling business.  You talk about Joker Poker.  I assume
19   that means these are gambling machines you are referring to,
20   Joker Poker.  Am I correct?
21          MR. GENSER:  Yes.
22          THE COURT:  You allege violation under 1955 (2)
23   which is the federal crime of course.  You make no reference
24   here to the sum of $2,000 in a single day that is one of the
25   elements under 1955.  When you then plead Racketeering Act

1    32, which you also allege is a violation of 1955, you do make

2    reference there to the sum of $2,000 which satisfies 1955.

3    You don't refer to the specific state penal codes as you do

4    when you talk about the substantive counts in 66 and 67.  You

5    had some reason, I guess, in that respect.  I am not so sure

6    why you could not have made reference to the statutes even

7    though under Cirrillo and Arena there is a looser standard,

8    so to speak, for pleading RICO predicates than substantive

9    counts, perhaps.

10           Why is it that you left out the $2,000 for

11   racketeering act 31?  You will see the progression in my

12   questioning after you answer that question.

13           MR. GENSER:  I think I understand your Honor's

14   concern.  It is my understanding that the way Section 1955

15   works is there are alternative types of conduct that can

16   violate the statute, and there is sort of an either or in

17   terms of whether a business meets -- an illegal gambling

18   business meets those elements.  I think it is either $2,000

19   in a single day or substantially continuous operation for a

20   period in excess of 30 days.

21           THE COURT: I am trying to find what statutes you

22   are referring to.

23           MR. GENSER:  1955.

24           THE COURT:  What state law are you talking about?

25           MS. JESTIN:   First addressing the federal law in

1    the first question you asked.

2              THE COURT:  The 1955 requires $2,000 in any single

3    day.

4              MR. GENSER:  What I am saying to your Honor, I

5    believe 1955 doesn't require that.  That is one way that the

6    statute can be violated.  It is that or --

7              THE COURT:  What other part of 1955 would be

8    implicated in this particular charge?

9              MR. GENSER:  I don't have it right in front me.

10             THE COURT:  You talk about five or more people.  I

11   am trying to follow the bouncing ball.  I would like to know

12   what you are referring to in terms of the state penal law.

13   You may not have to set it for the --

14             MR. GENSER:  I am addressing section 1955

15   subsection B.

16             THE COURT:  B.

17             MR. GENSER: Subsection B, subindex 3B1.3 (b)

18   defines an illegal gambling business means a gambling

19   business which, one, is a violation of the law of the state

20   or subdivision in which it is conducted.  Two involves five

21   or more persons who conduct, finance, manage, supervise,

22   direct or own all or part of such business.  Three, has been

23   or remains in substantially continuous operation for a period

24   in excess of 30 days or has a gross revenue of $2,000 in any

25   single day.

1          That is why -- that is not a requirement in every

2   case.  If you can show that the business --

3          THE COURT:  In other words, if it has a 30-day

4   continuity or the $2,000.

5          MR. GENSER:  Yes.  It is definitely difficult to

6   parse out.  I think it is clear once you focus on that

7   particular provision that that aspect of it is --

8          THE COURT:  I can tell you.  I read that and of

9   course I read RICO Act 232.  I am not and lay juror.  I had a

10  difficult time parsing out.  You even had a difficult time

11  parsing it out.  I think in fairness to the defense, while we

12  have this rather loose pleading requirement for predicate

13  acts that they are entitled to have a little bit more

14  knowledge of what you are talking about.  They have a little

15  more knowledge now than they had before.

16         MR. GENSER:  We did try to identify the type of the

17  gambling business in the indictment.  It is not just

18  boilerplate.  We meant Joker Poker machines and things of

19  that nature.

20         THE COURT:  Let's turn to your substantive counts.

21  Here, 66, which is Joker Poker, that is the name of the

22  machine?

23         MS. JESTIN:   Type of machine, yes, that is

24  correct.

25         THE COURT:  You don't reference the $2,000 there.

50

1   You do reference specifically Penal Law Section 225.10. It is

2   the position of counsel you should do more than that, that

3   you should set forth the elements of the state law.  I don't

4   think that necessarily is required, but I will hear from Mr.

5   Mitchell about that so you can make a record.

6          MR. MITCHELL:   Your Honor --

7          THE COURT:  Let me finish first.

8          Count 67, you do specifically talk about the

9   $2,000.  When I look at 225.10, it doesn't say what you just

10  told me your RICO predicate is all about.  It does

11  specifically talk about promoting gambling in the first

12  degree.  That's the specific reference you are making in

13  count 66.  Then the elements of that are twofold.  The first

14  one is engaging in bookmaking to the extent that he receives

15  or accepts in any one day more than five bets totalling more

16  than $5,000.  I don't see that at all in count 66.  You are

17  not really referencing that specific type of bookmaking

18  activity which is the basis of 225.10.

19         May have had in mind, maybe, 225.30, which doesn't

20  reference a $5,000 threshold requirement.  It talks about

21  possession of a gambling device.  I find considerable amount

22  of confusion in terms of what it is you are specifically

23  charging in that substantive count which I think requires at

24  least reference to the state statute.

25         What's going on here?

1          MR. GENSER:  Judge, I think the indictment in count

2    66, the Joker Poker indictment identifies New York Penal Law

3    Section 225.10 as the state statute which is alleged to be

4    violated.  I am somewhat handicapped right now because I

5    don't have a copy of that in front of me.

6          THE COURT:  225.10?

7          MR. GENSER:  Yes.

8          THE COURT:  Take my copy.  You are talking about in

9    count 66 gambling machines whereas 225.10 doesn't necessarily

10   reference gambling machines.  25.30 does.  Under 225.10, you

11   have to have $5,000.  The federal statute requires $2,000.

12   Since we are talking about New York State, you have to deal

13   with $5,000 it seems to me.  There may be other slants which

14   has a $2,000 requirement or $500.  Who knows?

15         The issue that really I am troubled with has the

16   grand jury been presented with sufficient information to be

17   able to render an indictment in respect to substantive count

18   66 and 67 based upon $5,000.

19         MR. GENSER: Do you want to say something.

20         MR. MITCHELL:  I am not anxious to say anything.

21         MR. GENSER:  Section 225.10 offers two ways in

22   which the statute can be violated.  It also includes language

23   that is defined elsewhere in the statute.  I don't have it in

24   front of me.  There are definitions of what bookmaking

25   actively is and what policy and lottery schemes and

52

1    enterprises are.

2            THE COURT:  I have to read it.  It seems to me you

3    have to show $5,000 of activity.  You are telling me you

4    don't.

5            MR. GENSER:  That is under the first prong.  The

6    second prong is receiving in connection with policy or

7    lottery scheme or enterprise, money or written records from a

8    person other than a player who --

9            THE COURT:  You are talking about gambling machines

10   here.  You are not really saying anything here that tracks

11   that subdivision.

12           MR. GENSER:  Judge, what I am saying is the

13   definition of lottery or policy scheme as defined in the

14   statute is broad enough to include a Joker Poker machine.  A

15   Joker Poker machine, lottery --

16           THE COURT:  What is the purpose of 225.30 which

17   talks about gambling devices which is exactly what you say in

18   count 66?

19           MR. GENSER:  Judge, I mean perhaps that could also

20   have been charged as the underlying state violation but we

21   have identified this statute.

22           THE COURT:  I have some problems with whether you

23   have legally properly pled 225.10 in count 66.  I may require

24   some further submissions from counsel.

25           Let's turn to --

53

1          MR. MITCHELL:   Could I make one point on that?

2          THE COURT:  Yes.

3          MR. MITCHELL:  This is precisely what happened in

4    United States v. Miller, which is an Eighth Circuit decision,

5    the only Court of Appeals to ever decide this question. In

6    Miller there was allegation that a particular state statute

7    was violated but they didn't set forth the elements.

8          Here is what the Court in Miller said.

9          In Miller, the problem is that they do not even set

10   forth the section of the state law.

11         In the decision it says an allegation that some

12   state statute has been violated does not fully, directly,

13   expressly without any uncertainty or ambiguity set forth all

14   of the elements necessary to constitute the offense intended

15   to be punished.  The Court goes on to say -- I think this is

16   particularly appropriate under the circumstances of what

17   we're talking about now.

18         It says the indictment contained no assurance that

19   the grand jury deliberated on the elements of any particular

20   state offense.  The indictment at bar contained no hint of

21   the acts for which Miller was being indicted.

22         Your Honor just now, it was sort of convenient that

23   the government couldn't even explain to you without

24   referencing the statute precisely what the state law

25   required.  The grand jury would never have known that.

54

1          THE COURT:  That's why we are talking about this.
2    Let me tell you about Miller here.  I don't read Miller the
3    way you do.  The difference factually in Miller and in 66 and
4    67 is that in Miller was no reference whatsoever to anything
5    other than 1955 (b), the federal law.  There is no reference
6    to the state statute.
7          MR. MITCHELL:    That's true in 33 and 31.
8          THE COURT:  Here.
9          Those are RICO acts which take on different aspects
10   in terms of liberal requirements for pleading purposes.  Now
11   we are talking about substantive crimes.  RICO acts are
12   really governed -- I spoke about that.   When we talk about
13   the substantive crimes, I want to point out to you that's
14   what is different in this case.  The government does
15   reference specific title, chapter, verse of the state crimes.
16         In Miller the Eighth Circuit distinguished a case
17   from the Fifth Circuit called United States v. Marifield  --
18   M-a-r-i-f-i-e-l-d -- saying the government's reliance on
19   Marifield was misplaced by -- unlike the instant case, the
20   indictment there described the conduct in question as the
21   operation of a business for placing bets on dice and cards.
22   The indictment also stated the title and section of the state
23   law alleged to have been violated.  I read Miller as drawing
24   a distinction between an indictment which doesn't make any
25   reference to the state statute by chapter, book and verse, so

1   to speak, as compared to a pleading such as we have here

2   where there is specific reference to the actual penal law.

3          MR. MITCHELL:   Your Honor, if I may.  To what end

4   does it serve?  I mean, when you think about it from a

5   practical level.  The grand jury has no clue what that --

6          THE COURT: You are arguing about something which

7   you suggest is a common sense type of thing which I tend to

8   agree with you.  I am talking about the law.

9          MR. MITCHELL:  Constitutionally, your Honor, if it

10  is an element of the offense, it has to be passed on by the

11  grand jury.

12         THE COURT:  I don't agree.  I think for pleading

13  purposes, to refer to the nature of the crime, specific

14  information you spoke about, that little bit here and the

15  reference to the particular state law of the statute by penal

16  law doesn't have to have the elements set forth.  That's why

17  my reading even of Miller especially as pointed out the way

18  it distinguishes the Fifth Circuit case in Marifield (sic).

19  Think about that.

20         Let me now turn back to the government.

21         In 67, you do refer specifically to 225.10 and to

22  the $2,000.  All right.  Under 225.10 unlike 1955 you need

23  $5,000.  How do I know whether the grand jury was presented

24  with sufficient evidence to justify a $5,000 scenario if for

25  argument's sake all that was before the grand jury was

1    $2,000.   Then wouldn't I have to dismiss count 67 at the very

2    least?

3              MR. GENSER:   The answer to that is your Honor does

4    not have to dismiss the count because your Honor can rely

5    upon the fact that the jury was instructed, the grand jury

6    was instructed on all of the elements of all of the offenses.

7    We specifically listed the state statute they were

8    instructed --

9              THE COURT:   Did you tell the jury they had to be

10   satisfied that there is $5,000?

11             MR. GENSER:   Yes, judge.

12             THE COURT:   What you'll do is send to me in camera

13   that part of the grand jury minutes where you gave the jury

14   that instruction and also, you know, support it with that

15   part of the grand jury minutes which shows that we're not

16   just dealing with $2,000 but we are dealing with $5,000.

17             MR. MITCHELL:   Since it is not evidentiary, could

18   we see that?

19             THE COURT:   No.  Let me take a look at it.  I think

20   that's the right way to proceed.  I think you can trust my

21   judgment on these things.

22             MR. MITCHELL:   Very well, your Honor.

23             THE COURT:   If I find that the jury wasn't

24   charged-- if they were charged only on $2,000 and there is

25   nothing to support $5,000, I will dismiss that count.  Let me

57

1    take a look.

2            MR. GENSER:  I believe that the minutes will

3    satisfy your Honor's concern.

4            I would like to also point out that the section

5    referenced 225.10 has those two different definitions of

6    gambling activities.  Those are terms of art defined in a

7    statute.  I believe that the lottery and policy scheme prong

8    also would cover --

9            THE COURT:  Maybe you have to give fair notice if

10   you are not going to set forth the particular elements which

11   as I read the law apparently you don't have to.  I think at

12   least you have to make clear which aspect of a particular

13   statute you rely upon by making appropriate substantive

14   reference in the language you use in the count.

15           In respect to both 66 and 67, I want you to submit

16   to me for my in camera review what you have before the grand

17   jury that you believe would support your claims.  I will be

18   particularly interested to see how you charge the grand jury

19   on count 66.

20           You understand what I need.  We'll take a very

21   close look at that.  You are clear about my rulings at least?

22           MR. MITCHELL:  Yes.

23           THE COURT:  You have a record.

24           All right.

25           Would you be kind enough to do that by maybe next

1   Tuesday so I can also take that to Puerto Rico with me?  I

2   would like to come to peace with what is going to survive in

3   the indictment well in advance of the start of the trial.

4            MR. GENSER:  Very well.

5            THE COURT:  Let's see what else is left here.

6            I am going to deny all of the other motions.  It is

7   Mr. Mitchell?

8            MR. MITCHELL:   Yes, your Honor.

9            THE COURT:  I have listed here that you take

10  objection to what you claim is the consolidation of several

11  counts because they are subsets of one larger offense.  That

12  is an outgrowth of some of the things we discussed before.  I

13  deny that.

14           MR. MITCHELL:   It is actually the other way around

15  though.

16           THE COURT:  Yes.  Then you have this issue of

17  whether or not you can charge a crime composed of the

18  deprivation of so-called democratic rights.  You can.  My

19  understanding of where the circuit is at in that respect is

20  reflected in United States v. Bolomo, 176 F.3rd 580,

21  specifically at 592 to 593.

22           MR. MITCHELL:   I don't disagree with that.   The

23  reason principally this is raised, the Supreme Court is going

24  to hear --

25           THE COURT:  You want to preserve your rights.

59

1      MR. MITCHELL:   Right.

2          The Supreme Court is going to reach in NOW vs.

3  Schindler --

4          THE COURT:  Do you need what I said?  I said I

5  refer to United States v. Bolomo, which is 76 F.3rd 508 at

6  pages 592 to 593.  Then Mr. Mitchell said he was just

7  preserving the record, agrees that is the position of the

8  Second Circuit and that apparently certiorari has been

9  granted.

10         MR. MITCHELL:  In the case of NOW v. Schindler, it

11  was a civil RICO case in which the National Organization Of

12  Women went after antiabortionists and the predicates that

13  they used were Hobbs Act, saying it was deprivation of

14  property to deprive woman of abortional services.

15         The Court is going to hear the issue on whether or

16  not that's a sufficient property right to justify Hobbs Act.

17         THE COURT:  It is wise of course of counsel to

18  preserve your rights.  I don't see where this case dealing

19  with deprivation of union benefits is quite the same thing as

20  the NOW case.  We'll see how it washes out.  The issues is

21  preserved.

22         I read another case by the Second Circuit as

23  reinforcing the position that the indictment properly alleges

24  deprivation of property rights, United States v. Arena at 180

25  F.3d, 380, at page 392.  That also is a 99 Second Circuit

1    decision.   That talks about the Hobbs Act being not limited

2    to tangible things but includes intangible assets, such as

3    the right to solicit customers and conduct unlawful business.

4            You have a proper record.

5            MR. MITCHELL:   Thank you, sir.

6            THE COURT:   All right.

7            The last thing you raise is how the forfeiture

8    count, which is what count 72 or something like, that is to

9    be processed.   My understanding, first you have to get a

10   conviction and then there could be a subsequent proceeding

11   focusing on the forfeiture issue if the government wishes to

12   proceed on that basis and separate evidence would have to be

13   forthcoming.

14           I don't think we have to deal with that now.

15           MR. MITCHELL:   The only question is, does the jury

16   decide--

17           THE COURT:   My understanding, the jury decides in a

18   separate proceeding.

19           MR. MITCHELL:   Yes, sir.

20           THE COURT:   Do you agree with that?

21           MR. GENSER:   I think I do, judge, but I think your

22   Honor is right.   We can cross that bridge when we get to it.

23           THE COURT:   We have enough on our plate right now.

24   I have handled all of your motions.

25           Mr. Mitchell, is there anything I may have

61

1   inadvertedly left out?

2           Mitch no, sir.  I believe that's it.

3           THE COURT:  Thank you.

4           The last thing I have on my list that is pending is

5   the Bondi motion.  Unless there is something else to talk

6   about, we can let everybody else go home and keep you

7   captured here since we have different issues that flow from

8   the hearing we had.  We could take a little break right now.

9           Is there anything else we need to do with everybody

10  else?

11          MR. SHARGEL:  No.

12          THE COURT: I will see you Tuesday morning 10:00.

13          Thank you all for you cooperation.  Let's take a

14  ten-minute break.

15          Mr. Bondi's attorney will stay behind.

16          (Recess).

17          THE COURT: Let's now focus on the issue of the bond

18  that flows from the hearing that the Court conducted on

19  October 24th, 2002.  Mr. Medina is here.  The government

20  counsel is still standing tall here.

21          Mr. Medina, my heart is sympathetically disposed to

22  your plight.  I guess if the $30,000 was released, arguably,

23  as a practical matter, there may be some fees due to you and

24  that would be a source of funds.  I can't do it for you.  I

25  labored hard over thinking about whether he could do it for

62

1    you.  In good conscience to my oath of office, I can't.  I

2    will tell you why.

3           First of all, let me just make sure that we're not

4    dealing with any issue as to whether the underlying warrant

5    was valid and was properly executed.  I thought we cleared

6    the decks on that during our colloquy when I said we don't

7    have to deal with the issue.  You agreed.  Yet, in your

8    papers you still revisited that issue.

9           There is no problem here with the search warrant or

10   the search.

11           MR. MEDINA:  No, your Honor.

12           THE COURT:  Do you want to have the opportunity to

13   somehow say something different to me now than what you said

14   to me back in October?

15           MR. MEDINA:  Judge, I think the essential issue

16   here was whether or not the government had met their burden

17   of proof with respect to whether or not these particular

18   proceeds were the proceeds of crime.

19           THE COURT:  I am going to deal with that.  I am

20   talking about, for the nicety of the record, so to speak, the

21   issue of whether you are questioning whether the search

22   warrant was valid or whether it was validly executed.  You

23   have not yet answered that.  Your papers seem to fly back and

24   forth a little bit even to this date on that issue.

25           I try to lay that to rest when we were last here on

63

1   October 24th.  I have this colloquy.  I asked you whether,

2   Mr. Medina, you had ever really raised this issue before.

3   You really seriously want the opportunity to question whether

4   there was a legitimate basis to obtain the search warrant

5   because I think you may have said that.  It doesn't seem as

6   if you are really serious about that.   You said no, your

7   Honor.

8          So we don't have to deal with that.  We are going

9   to hold that and not deal with anything dealing with the

10  search warrant.

11          MR. MEDINA:  The probable cause issue --

12          THE COURT:  Okay.  We are squared away on that.

13          Let me just set forth the facts which I believe in

14  the hearing I think arguably are relevant to the decision

15  which I am constrained to render against your client.

16          One, October 28th, 2001, Richard Bondi received a

17  settlement in the amount of $60,790.40.  Those are legitimate

18  funds.  Nobody is questioning that.  The next day, October

19  29, he opened a bank account at the Granateville Shop-Rite

20  Branch of Staten Island Bank and Trust.  Mr. Bondi had other

21  accounts at the bank, as a repeat customer was eligible to

22  make withdrawals from the new account without waiting for a

23  30-day grace period to pass.

24          According to the witness, Lisa Miguel, the

25  assistant manager at the bank, the bank would even be willing

64

1    to cash the check without waiting for the check to clear if

2    requested by the customer.

3            Three, on November 1, 2001, Mr. Bondi withdrew

4    $2,000 from this account.  On November 2, November 3,

5    November 5, November 6, November 7, November 8, November 9

6    and November 13, he withdrew $6,000 on each of those days,

7    leaving a total of $790.40.  So $60,000 was taken from the

8    bank.

9            Four, Mr. Bondi could have withdrawn the entire

10   amount at one time from the larger branch located a half mile

11   away.  Additionally, according to Ms. Miguel, the bank would

12   have been willing to cover a withdrawal of the entire amount

13   from the Graniteville branch within a few days' notice to

14   receive a delivery of the cash if Mr. Bondi had asked.

15           Five, approximately three months later, on January

16   22, 2002, a Court ordered search warrant based upon probable

17   cause was issued by the Honorable Allan J. Meyer, judge of

18   the Criminal Court of the City of New York to search the

19   Bondi residence for, amongst other things, gambling records

20   and United States currency and other proceeds of illegal

21   bookmaking.

22           Six, the police found $30,000 of which $28,700 was

23   in $100 bills.  All this money was bundled and stored in a

24   garment bag in a closet in the master bedroom.

25           Seven, Richard Bondi at the time the $30,000 in

question was removed from his home claimed the money was a result of an accident settlement.

Eight, three weeks later, on February 11, 2002, Special Investigator Joe Poccia overheard a conversation in which Richard Bondi and other defendants appeared to be speaking about money.  Their conversation, although somewhat garbled, is construed by the Court as referring to the money as contraband/gambling proceeds or might be construed.

I will not make that specific factual finding.  I will just note that it arguably could be construed as referring to the money as contraband gambling proceeds but it is not necessary for me to specifically so find in terms of the decision which I am rendering more specifically.

During the exchange of conversation Sunny Ciccone stated:  Let's see if we are going to tie this money into the machines," and Bondi stated, "I got the best explanation to prove where that money came from."

Nine, Special Agent Poccia said that the machines that Richard Bondi collected money from did not take $100.  However, he also testified that in his experience money was often packed in large bills and bundled in even number of dollars.

Last, No. Ten, Richard Bondi produced no receipts showing where the settlement money has been spent nor did he testify or offer any evidence other than calling Ms. Miller--

66

1  Medina I think you called her as well.

2         MR. MEDINA:  That is correct.

3         THE COURT:  Those are salient facts.  Let me now

4  articulate my conclusions.

5         If a motion for return of property is made while a

6  criminal prosecution is pending, the burden is on the movant

7  to show that he or she is entitled to the property.

8  Generally a rule 41 (e) motion is properly denied if the

9  defendant is not entitled to lawful possession of the seized

10  property, the property is contraband, or subject to

11  forfeiture or the government's need for the property as

12  evidence continues.

13         Here, in the Court's judgment, Bondi has not

14  sustained his burden of proof which is by the preponderance

15  of the evidence that the property is not contraband.  The

16  money is clearly not contraband per se, however it appears to

17  be derivative contraband.

18         There are two types of contraband; namely,

19  contraband per se and derivative contraband.  Included in the

20  term contraband per se are things which intrinsically are

21  illegal to possess such as illegal narcotics, unregistered

22  stills, counterfeit money, sawed off shotguns and illicit

23  gambling devices.  Included in the term derivative contraband

24  are things that are not ordinarily illegal, like guns,

25  automobiles, ships and currency that become forfeitable

1    because of their relationship with a criminal act.

2            Bearing in mind that the defendant has the burden

3    of proof, the fact that the money was in a large sum, it was

4    kept tied up in a rubber band and stored in a garment bag in

5    the bedroom closet suggests Bondi had knowledge that this

6    money was incriminating, and the fact that there was no

7    explanation given to the Court whatsoever as to what happened

8    to the $6,000 that was withdrawn three months prior to the

9    search warrant being executed is troublesome to the Court.

10   It may well be that that money was kept there as a cover for

11   illegal gambling activities.  It may be that it was lawful.

12   But there is no explanation that I have as to why that money

13   was drawn out and $30,000 of it was kept three months later

14   in these most suspicious locations.

15           MR. MEDINA:  May I be heard, your Honor.

16           THE COURT:  I am just giving you my decision.

17           I think it was incumbent upon the defendant,

18   consistent with its burden of proof, to offer something more

19   than the fact that there was $6,000 of lawful moneys that

20   were initially placed in a bank account.  I don't understand

21   why people would take all that money out, why three months

22   later there would be $30,000 that would be found in a garment

23   bag.  All of that is counterintuitive to the Court in terms

24   of being able to conclude that the defendant sustained his

25   burden of proving to the Court in the face of this particular

68

1    motion that these moneys conclusively did not constitute

2    contraband.  That is the problem I have with the case.

3            Mr. Bondi did not have to testify.  That was his

4    right.  I needed something more than the fact that three

5    months prior there were lawful funds put in a bank.  I don't

6    have that.  That is really what ultimately has triggered my

7    decision that you haven't met your burden of proof.

8            When it comes to dealing arguably with a forfeiture

9    scenario, there the burden shifts to the government.  If the

10   government wanted to have that money deemed to be forfeited

11   funds, it would have to go forward and satisfy the Court that

12   indeed they should be forfeited.  I think these shifting

13   burdens really make all the difference in the world for

14   resources out.

15           Let me explain.  I was concerned about what

16   possible res judicata the collateral consequences with

17   respect to any future issues such as forfeiture might be

18   triggered by the Court's decision.  I haven't been able to

19   locate any case law dealing with that particular issue.  If

20   there is going to be a future forfeiture proceeding, the

21   determination on Bondi's current motions will have no

22   controlling effect over such a forfeiture proceeding.

23           I thought I ought to make that clear.  They don't

24   preclude any argument in the future that the Court has

25   already ruled this is contraband and therefore it is

69

1    automatically.

2            I think the circuit's recent decision in United

3    States v. U.S. Currency in the amount of $119,984 at 304 Fed.

4    165 rendered this year, 2002, makes it clear that there are

5    separate burdens and separate processes that the parties

6    would be able to avail themselves of.  There would be the

7    opportunity to have discovery in both sides and the

8    government would be able to go forward if it chooses to do so

9    to claim that indeed these funds should be forfeited.  We are

10   not dealing with that here today.

11           It may well be that they won't be able to sustain

12   that burden and the money will go back to you, to your

13   client, at that time.

14           That is basically my take.  That's my decision in

15   denying the motion.

16           If you wish to say something on the record, I will

17   give you the opportunity.

18           MR. MEDINA: Absolutely, your Honor.  It was my

19   reading of Rule 41 (e) and your Honor reading of 41 (E) when

20   we had the hearing that a 41 (e) proceeding for the return of

21   property post-indictment shall be treated also as a motion to

22   suppress under Rule 12.  Your Honor ruled that based upon

23   that, this was now a motion to suppress under Rule 12 where

24   it was the government's burden of proof to demonstrate that

25   these particular proceeds were the specific proceeds of a

70

1  crime, that they were in fact -- that these particular --

2          THE COURT:  I may have said that but I come to the

3  conclusion that the burden is here upon you and I may be

4  wrong about that but that's my take.

5          What do you think Mr. Genser, am I right?

6          MR. MEDINA:  If I could just be heard.  I

7  understand what your Honor is saying.  That's what your Honor

8  ruling was before the hearing and that was the parameters of

9  the hearing.  That is what we based that on and that's how we

10 cross-examine the witness and that's how we presented our

11 case.  It is one thing to say these are the rules of the

12 game, this is the burden of proof is now on the defense.

13         THE COURT:  I reconsider.  I will reconsider my

14 decision.

15         What do you say, Mr. Genser?

16         MR. GENSER:  Judge, I have to say that the motion

17 should be as a motion to suppress where the burden is on the

18 government, I don't think even if we accepted that as true

19 and as the applicable standard, I don't think it changes the

20 outcome here.

21         A suppression motion attacks the legality of the

22 seizure.  All the government would need to do to sustain its

23 burden on the motion to suppress would be to prove the

24 warrant was properly executed lawfully and that the

25 contraband, there was probable cause at the time to believe

71

1    that the evidence appeared to be contraband.

2            Nothing that your Honor has said or that Mr. Medina

3    has said would suggest that the government failed to meet

4    that burden.  There is no additional burden in a suppression

5    motion for the government to prove specifically that the

6    money is forfeitable.

7            MR. MEDINA:  We are not talking about forfeiture.

8    We are talking about identifying that as contraband.  That

9    was the focus of the hearing.  That's what your Honor took

10   evidence on.

11           THE COURT:  I do recall now maybe I did say that

12   the burden is upon the government.

13           I will have to reconsider my decision if that is

14   the case.

15           MR. MEDINA:  That is the case.  It is stated here

16   in the minutes.

17           THE COURT:  That's what I told my law clerk.  I

18   have to decide who decides who has the burden under this

19   particular statute.

20           I thought we had it down right.  Maybe not.

21           MR. MEDINA:  If I could read.

22           "Now my understanding of the way things should

23   proceed, Mr. Medina, certainly a motion can be made by the

24   defendant for the return of property that the government has

25   in its possession.  The motion is governed by Rule 41 (e) of

72

the Federal Rules of Criminal Procedure.  I take it that you
folks have looked at that.  The sense that this is to be
treated as a motion to suppress under Rule 12 that is
specifically referenced in 41 (e), that places the burden on
the government to support the retention of the property.  Is
that right, Mr. Wail (ph)?

"Mr. Wail:  Yes, judge."

That's how we proceeded, judge.  That's the burden
of proof that I was going under, your Honor.

THE COURT:  I will reconsider my decision in light
of that.

Thank you for calling that to my attention.  We'll
see what goes on in the future when I come to peace with that
issue.

MR. MEDINA: Thank you, your Honor.

MR. GENSER:  Thank you, judge.

THE COURT:  If you want to submit anything at all
dealing with the burden of proof, I don't have any specifics
in front of me as to what the law is in that respect.  We
have this peculiar intersection between 41 and 12 here and
that's what troubles me.

MR. GENSER:  Your Honor, I would just suggest that
on the record that your Honor has recited the government did,
even assuming that there was an extra burden on the
government to prove that the funds were specifically

1   forfeitable, that we've satisfied it and I would query

2   whether Mr. Medina wants to make a proffer as to whether

3   there would be some additional evidence he would have liked

4   to submit if it turns out that your Honor ends up deciding

5   that the burden was on him.  What is there that we're all

6   missing?

7            That might help us all to figure it out and get to

8   the bottom.

9            THE COURT:  Do you want to say something else?

10           MR. MEDINA:  Your Honor, we had a hearing.  We made

11  a record based on what your Honor's ruling was, what the

12  burden of proof of was.  I think Rule 41 (e) is very clear --

13           THE COURT:  I am going to deny this.

14           I am going to say now on the record that even if I

15  am wrong and the burden is on the government, based upon the

16  findings that I have made, the government has satisfied its

17  burden.

18           You are not going to get the money back now.

19           MR. MEDINA:  Your Honor, based upon the fact that

20  your Honor has made a finding that the standard of proof was

21  on me --

22           THE COURT:  I am saying that in any event, I will

23  render the same --

24           MR. MEDINA:  In the interests of fairness, when I

25  am litigating a hearing and I am told that the burden is on

74

1    the government, and now your Honor is saying the burden was

2    on me, I respectfully request an opportunity to reopen the

3    hearing because I never had an opportunity to properly

4    address the burden of proof.

5         THE COURT:  Let me ask you this.  I have a lot of

6    things to do here.

7         If I am now saying even if the burden is on the

8    government, which is what you were appropriately apprised was

9    my initial determination, that the government has sustained

10   its burden under these facts that I have mentioned.  The

11   highly suspicious nature of these funds, the tape that I

12   listened to, the fact that these moneys were taken out, that

13   there is reference here that he's got a very good excuse for

14   the money, whatever that statement was all about, again, I

15   think it supports the government's burden.  I am not going to

16   go beyond this.

17        MR. MEDINA:  If I could address those.  The fact

18   money was taken out that the government and Court has

19   acknowledged was legitimate money in the bank, judge, the way

20   it was taken out is clearly irrelevant.

21        THE COURT:  I don't agree.  You have my decision.

22   I'm sorry for the confusion I may have caused, but in any

23   event, that's my decision.

24        MR. MEDINA:  Thank you.

25        MS. JESTIN:   Have a nice weekend, judge.

75

1          MR. GENSER:   Thank you, judge.